qualify for increased wages and advancement subject to the provisions of this Section. The Joint Apprentice Committee shall function as provided until and in case the Central Printing Trades Continuation School, or similar school, be reopened, in which case arrangements are to be made between the Union and the Publishers for utilizing the facilities of such school.

The Publisher shall afford apprentices every opportunity to master the work of a journeyman that the foreman deems consistent with the efficient management of the room. To this end, should the requisite number of journeymen not be available in the pressroom for one or more full days or nights, or should a journeyman be absent from his station temporarily during the day or night, the foreman shall give the opportunity of learning the duties of such a position to an apprentice. When temporarily employed for one or more full days or nights as above, the apprentice shall receive the rate which the journeyman would have been paid.

The foreman shall distribute the opportunities to learn the trade among all the apprentices in the room according to his judgment and, as above, or from time to time as he finds it practical, shall assign apprentices otherwise to work on presses, but in no case shall any such assignment be made when it involves, directly or indirectly, any increase in the number of journeymen and apprentices.

The term of apprenticeship shall be four (4) years subject to the provisions of this Article. At the satisfactory conclusion of his term of apprenticeship, an apprentice shall be eligible for journeyman membership in the Union and to be employed as a journeyman.

## 31.    BENEFIT INSURANCE

SECTION 31. The Publisher will provide a supplemental sickness and accident benefit insurance policy to each regular situation holder that will provide a cash benefit of $225.00 dollars per week in addition to weekly disability or workmen's compensation benefits to which he is entitled. If the Insurance Carrier has not paid the weekly $225 supplemental

CONFIDENTIAL

NYP 00426

disability payment by the end of thirty (30) days from the date a claim was filed, the Publisher will make such payments. Employees getting such payments from the Publisher will, upon receiving the delinquent payments from the Insurance Carrier, repay to the Publisher the amounts paid to him by the Publisher.

Such benefits shall continue for only one (1) period of twenty-six (26) weeks in any calendar year commencing with the eighth (8th) consecutive day of absence due to sickness or accident.

All regular situation holders shall be eligible for benefits provided they have worked two hundred (200) days or more in the prior current year. Day's worked shall be computed in accordance with the vacation section of the Agreement and shall include vacation days.

All premiums for such insurance shall be paid by the Publisher. The policy shall be in standard form, maintained with an insurance company licensed to do business in the State of New York and the Union will be furnished with copies of such insurance policies.

32. CREDITS FOR ATTENDANCE AT JOINT MEETINGS

SECTION 32. Bargaining unit employees shall receive credits toward vacation, optional leave and Supplemental Sickness & Accident Benefit Insurance Policy coverage for attendance at any joint meetings between the Publisher and the Union.

33. HEALTH AND SANITATION

SECTION 33. The Publisher agrees to maintain conditions of health and sanitation in conformity with all applicable federal and state laws. All employees are expected to comply with measures implemented by the Publisher to protect their health and safety.

The Publisher shall endeavor to furnish at all times a healthful, sufficiently ventilated, properly heated, and well-lighted space for the performance of all work. If the

CONFIDENTIAL

NYP 00427

foreman or the Publisher does not rectify any of the condition's above set forth within forty-eight (48) hours, the matter shall be likewise referred to the Union. The chapel chairman, however, shall have the right to give immediate notice to the Union in the event of any safety device becoming defective. If the Union sustains the complaint it shall be referred to the Joint Conference Committee.

During the term of this Contract both parties jointly or either party separately may request the Division of Industrial Hygiene of the New York State Department of Labor to conduct air sampling tests in the pressroom. Both parties will cooperate in the making of any such test.

All employees are required to wear standard safety shoes and standard hearing protection while in work areas.

First aid and emergency care coverage in case of injury or illness will continue to be provided through use of a hospital emergency room as they are as of the effective date of this Agreement. Security personnel working during production shifts will receive training on a periodic basis in first aid, including, but not limited to CPR. Upon a written request by the Union, the Chapel Chairman, within a reasonable period of time, shall be given the opportunity to review the certifications of said security personnel to ensure that they have been properly trained in first aid, including, but not limited to CPR.

The Publisher's Safety Director or his/her representative will conduct at least quarterly safety audits of the pressroom and will provide the Union with a copy of his/her written report regarding the safety audit within fifteen (15) days after the audit.

A safety committee will be formed consisting of three (3) members appointed by the Union and three (3) appointed by the Publisher. The committee shall meet monthly. The

CONFIDENTIAL

NYP 00428

Union or the Publisher may refer any complaints regarding occupational safety and health relating to the pressroom to the committee. At any new plant that may be constructed, the Publisher will endeavor to reduce the impact of noise on press room personnel while the presses are in operation.

## 34.    FOOD SERVICES

SECTION 34. The Publisher will maintain hot food services through either a cafeteria or food service machines and microwave ovens at 210 South Street seven (7) days per week from 11:00 o'clock a.m. to 2:00 o'clock a.m.

## 35.    RECALL RIGHTS

SECTION 35. Except as otherwise provided in this Section, all persons who are listed on the shop priority list who are or have been laid off as a result of a reduction in the work force, shall have recall rights for the duration of the contract. Those persons laid off as a result of a reduction in the work force shall be offered work in the pressroom in the order of their shop priority when work is available.

Any employee who is bought out by the Publisher or is or was ever bought out by the New York Post Co., Inc., or any of its predecessor Publishers shall not be entitled to any recall rights.

## 36.    WORK CLOTHES

SECTION 36. The Publisher will supply to all pressroom employees covered by this Agreement, work clothes at the Publisher's expense and up to seventy-five, dollars ($75.00) for the purchase of safety shoes once each year. The Publisher further agrees to launder the work clothes at no cost to the employees. An employee must present his/her receipt for the purchase of safety shoes in order to receive the payment set forth above.

CONFIDENTIAL

NYP 00429

37.    PAYROLL CORRECTIONS

SECTION 37. In the event an error occurs in a paycheck which exceeds one day's pay, the Publisher will make a correction which will be included in the next regular payroll.

38.    CREDIT UNION

SECTION 38. The Publisher will divert funds designated by an individual employee covered by the terms and conditions of this Agreement to a credit union designated by the Union. Any credit union designated by the Union must be covered by the appropriate Federal Insurance which shall cover each individual depositor up to $100,000 and the Publisher must receive three (3) weeks notice of the credit union selected by the Union before diverting funds.

39.    DUES CHECK-OFF

SECTION 39. The Publisher agrees to deduct each week from the wages of the employees covered by this Agreement such union dues, assessments and initiation fees, including per capita tax of the New York Newspaper Printing Pressmen's Union No. 2 and Graphic Communications International Union (collectively referred to as "Dues"), as the Union advises the Publisher in writing at least 10 days in advance of the payday are owing from such employees, provided that at the time of such deduction there is in the possession of the Publisher a current written assignment executed by the employee in the form set forth below. The Publisher shall remit such monies to the New York Newspaper Printing Pressmen's Union No. 2 within one week from the close of the payroll week in which such monies are deducted. The Publisher agrees to render to the Union a monthly report on such deductions within 10 days following the end of the week in which the last deduction for that monthly period was made.

CONFIDENTIAL

Date:_____

## CHECK-OFF AUTHORIZATION

### PRINTING PRESSMEN'S UNION NUMBER TWO, AFL-CIO

I hereby assign to the New York Newspaper Printing Pressmen's Union Number Two, AFL-CIO ("Union"), and authorize the Publisher to deduct from any salary or wages earned by me as an employee of the Publisher, an amount equal to all my Union membership dues, membership assessments, initiation fees and unemployment relief fund.

This assignment and authorization shall be irrevocable for one (1) year from this date or until the termination date of the collective bargaining agreement between the Union and the Publisher, whichever is sooner, and shall renew automatically with the same irrevocability for successive one (1) year periods, unless terminated by me in writing within 10 days prior to the expiration of any irrevocable period. Such written termination shall be effectuated by certified mail to the Publisher and the Union.

Employee's signature _____

Card No. _____      Social Security No. _____

Employee's Name (please print) _____

## 40.    ADMINISTRATION

SECTION 40. The Publisher shall cause its duly authorized officers to enter into such agreements and execute such documents as are necessary to administer the Publishers'-Pressmen's Welfare Fund and/or the Pressmen's-Publishers' Pension Fund and/or the Joint Apprenticeship Committee with respect to which the Publishers' Association of New York City has ceased to act as agent for the New York Post.

CONFIDENTIAL

NYP 00431

### 41.    401(K) PLAN

SECTION 41. During the term of this Agreement, the Publisher will maintain and allow bargaining unit employees to participate in the Publisher's 401(K) Plan.

Effective upon execution of this Amended Agreement, the Publisher will contribute five percent (5%) of gross wages to a maximum of $2000 per year to the 401k account of each participating pressman on the Post priority list.

Employees may withdraw the full or partial account balance attributable to their contributions as of any valuation date after he or she reaches age 59 1/2. Employees must file a request for withdrawal at least thirty (30) days before the valuation date. If an employee withdraws any portion of his or her contributions and earnings, he or she will not be eligible to make further contributions for a period of three (3) months.

### 42.    JOINT CONFERENCE COMMITTEE

SECTION 42. A Joint Conference Committee of four (4) members shall be maintained. It shall consist of two (2) members selected by the Publisher and two (2) members selected by the Union. A vacancy for any cause shall be filled immediately by the party in whose representation the vacancy occurs.

To this committee shall be referred for settlement any dispute (except as provided otherwise herein) arising under this contract between the Publisher and the Union if such dispute cannot be settled by conciliation between the Union and the Publisher. A discharge case will be heard within 72 hours if so requested by the Union. Conditions prevailing prior to a dispute shall be maintained pending final decision.

Any dispute arising under this Agreement which cannot be settled at the shop level is to be referred in writing to the Joint Conference Committee within sixty (60) days after the grieving party knew of the existence of the facts or circumstances giving rise to the dispute.

CONFIDENTIAL

In the absence of any excusing circumstances, any dispute not so referred shall be deemed to have been waived except to the extent that such dispute may be found to be a continuing dispute.

The committee shall meet within seven (7) days from the date on which any party signatory hereto raises an issue in writing and indicates that a meeting is desired, and shall proceed promptly to settle the dispute. If the committee reaches a decision, it shall be final and binding on all parties to the dispute.

If the committee fails to reach an agreement within ten (10) days from the date on which the dispute is referred to it, the members of the committee shall select a fifth and impartial member to act as chairman. The decision of the majority of this board of five shall be final and binding; provided any decision on any issue shall not be retroactive to a date earlier than the date on which the issue is raised; provided, further, this board shall have jurisdiction only over controversies properly and specifically referred to it, and its decisions cannot abridge the fundamental rights reserved by and to the Publisher and the Union.

Should the four (4) members fail to agree on a chairman within seven (7) days the dispute may be submitted by either party to the American Arbitration Association for arbitration under its Voluntary Labor Arbitration Rules and procedures then pertaining.

Nothing herein obligates either party to arbitrate differences respecting a succeeding contract.

Incorporation of the Joint Conference Committee clause into this contract constitutes a mutually binding commitment to settle disputes and disagreements peacefully and without interruption of an orderly relationship between the parties or between employer and employee. Negotiation, conciliation, and arbitration, if necessary, are set up as the only means to be used in adjusting differences. It is recognized that orders of a foreman must be followed fully

CONFIDENTIAL

and promptly, but if the Union charges that such orders are discriminatory or are outside the authority granted in the contract, then recourse to the Joint Conference Committee shall be prompt and procedure under the Joint Conference Committee clause shall not be delayed. In consideration of such promptness and undelayed action, interpretation of the contract by chapel or Union officers in conflict with orders of the foreman is forbidden. Thus, uninterrupted production and publication are guaranteed and immediate recourse to peaceable but binding grievance procedure is assured.

Any order given by the foreman responsible for such issue shall be complied with, and all work shall continue without interruption or curtailment pending settlement or decision by the Joint Conference Committee.

To deter the Union and the Employer from referring to the Joint Conference Committee trivial complaints or presenting grievances without just cause, the Joint Conference Committee or the Arbitration Board may, in its discretion, assess the cost of any case against the party presenting such trivial or undeserved case or cases for trial, otherwise the cost shall be divided equally between the two parties.

The Joint Conference Committee shall recognized that in the execution of this contract the parties hereto recognize and accept their obligations to maintain a peaceful and constructive relationship, and that there shall be no strikes, sympathy strikes, lockouts, vacations, absenteeism, or other forms of concerted action intended or tending to abridge the normal regular publication of the newspaper and that there shall be applied the spirit of cooperation and coordination between the parties that will give full and complete recognition to the mutuality of interests involved in the regular publication of the newspaper.

CONFIDENTIAL

NYP 00434

-37-

All complaints to the Joint Conference Committee from the Union or the Publisher must be in writing.

### 43.    SUSPENSION, MERGER, OR CONSOLIDATION PAY

SECTION 43. In the event of merger, consolidation or permanent suspension by the Publisher all employees on a mutually approved priority list with one (1) year of more of service who, by virtue of the merger, consolidation or permanent suspension, are deprived of their work at the newspaper shall receive severance pay of eight (8) weeks (40 shifts) pay.

### 44.    SUCCESSORSHIP

SECTION 44. This Agreement shall be binding upon the Publisher and its successors and assigns and no provision herein contained shall be nullified or affected in any manner as a result of any consolidation, sale, transfer, or assignment of the Publisher or by any change to any other form of business organization. The Publisher agrees that it will not conclude any of the above transactions unless an agreement has been entered into as a result of which this Agreement shall continue to be binding on the person or persons or any business organization continuing its business. The Publisher agrees that it will provide the Union with at least thirty (30) days prior written notice of any such consolidation, sale, transfer or assignment. It is the intent of the parties that this Agreement shall remain in effect for the full term hereof regardless of any change of any kind in management, form of business organization or ownership.

### 45.    ILLEGALITY - SAVINGS PROVISION

SECTION 45. In the event that any provisions of this Agreement shall become illegal, by reason of any federal or state law or regulation, it shall be superseded by such law or regulation only while such law or regulation is in force, and the remaining provisions of the Agreement shall not be affected thereby during the term of this Agreement.

CONFIDENTIAL

NYP 00435

## 46.    EXCLUSIVITY OF AGREEMENT

SECTION 46. N. Y. P. Holdings, Inc. and the Union have engaged in substantial negotiations for a new collective bargaining agreement. N.Y. P. Holdings, Inc. and its related companies have had long and extensive experience in operating newspapers around the world. The Union's agreement to this collective bargaining agreement and any related agreements is, in part, a result of the special circumstances and the unique qualifications of The N. Y. P. Holdings, Inc. Therefore, all of the provisions of this collective bargaining agreement or any agreement related thereto, including without limitation those provisions which effectuate operating cost reductions at the New York Post shall be solely for the benefit of N. Y. P. Holdings, Inc. In the event the United States Bankruptcy Court for the Southern District of New York transfers operational control of the New York Post to any entity other than N. Y. P. Holdings, Inc. or a related company, then this collective bargaining Agreement and other agreements related thereto shall be null, void and of no force and effect.

CONFIDENTIAL

IN WITNESS WHEREOF, we have hereunto executed this Amended Agreement this

_____ day of August, 2000

N. Y. P. Holdings, Inc.                    New York Newspaper
                                            Printing Pressmen's
                                            Union No. 2

By:_____              _____
John Amann                                 John M Heffernan
V.P. Labor / Circulation                   President

## PRESSMEN RATES EFFECTIVE 8/24/00

Appendix A

| NITE RATES | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| PIC | 106.523% | 6.6 | 6 | 36 | $1,171.75 | $234.35 | $35.508 | $53.262 | $71.015 | $106.523 |
| JOURNEYMEN (JM) | 100.000% | 6.6 | 6 | 36 | $1,100.00 | $220.00 | $33.333 | $50.000 | $66.667 | $100.000 |
| APPRENTICE 9 (A9) | 98.312% | 6.6 | 6 | 36 | $1,081.43 | $216.29 | $32.771 | $49.156 | $65.541 | $98.312 |
| APPRENTICE 8 (A8) | 97.474% | 6.6 | 6 | 36 | $1,072.21 | $214.44 | $32.491 | $48.737 | $64.983 | $97.474 |
| APPRENTICE 7 (A7) | 96.641% | 6.6 | 6 | 36 | $1,063.05 | $212.61 | $32.214 | $48.321 | $64.427 | $96.641 |
| APPRENTICE 6 (A6) | 96.347% | 6.6 | 6 | 36 | $1,059.82 | $211.96 | $32.116 | $48.173 | $64.231 | $96.347 |
| APPRENTICE 5 (A5) | 95.799% | 6.6 | 6 | 36 | $1,053.79 | $210.76 | $31.933 | $47.900 | $63.866 | $95.799 |
| APPRENTICE 4 (A4) | 95.519% | 6.6 | 6 | 36 | $1,050.70 | $210.14 | $31.840 | $47.759 | $63.679 | $95.519 |
| | | | | | | | | | | |
| JUNIOR PRESSMEN | | | | | | | | | | |
| LEVEL A (BA12) | 94.378% | 6.6 | 6 | 36 | $1,038.16 | $207.63 | $31.459 | $47.189 | $62.919 | $94.378 |
| LEVEL B (BB11) | 93.251% | 6.6 | 6 | 36 | $1,025.76 | $205.15 | $31.084 | $46.625 | $62.167 | $93.251 |
| LEVEL C (BC10) | 92.970% | 6.6 | 6 | 36 | $1,022.67 | $204.53 | $30.990 | $46.485 | $61.980 | $92.970 |
| LEVEL D (BD98) | 92.694% | 6.6 | 6 | 36 | $1,019.63 | $203.93 | $30.898 | $46.347 | $61.796 | $92.694 |
| LEVEL E (BE76) | 91.852% | 6.6 | 6 | 36 | $1,010.37 | $202.07 | $30.617 | $45.926 | $61.235 | $91.852 |
| LEVEL F (BF54) | 91.580% | 6.6 | 6 | 36 | $1,007.38 | $201.48 | $30.527 | $45.790 | $61.054 | $91.580 |
| LEVEL G (BG3) | 88.407% | 6.6 | 6 | 36 | $972.48 | $194.50 | $29.469 | $44.204 | $58.938 | $88.407 |
| LEVEL H (BH21) | 83.360% | 6.6 | 6 | 36 | $916.96 | $183.39 | $27.787 | $41.680 | $55.573 | $83.360 |

## PENSION CALCULATION

| PENSION | $2.06 | PER SHIFT FOR ALL PAY TYPES | NO LIMIT |
|---|---|---|---|
| | 10.221% | OF ALL SHIFTS PAID | NO LIMIT |
| WELFARE | 8.793% | OF ALL SHIFTS PAID | NO LIMIT |

-41-

CONFIDENTIAL

NYP 00438

August 9, 2000


Mr. John M. Heffernan
President
New York Newspaper Printing
Pressman's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

Any casual who obtains his/her card at the Post will receive credits for shifts paid in the calendar year in which he/she earned his/her card (e.g. a casual who obtains his/her card on January 1, 1994, will have earned his/her card in 1993).

If this letter accurately and completely sets forth our agreement concerning the issues addressed in the letter, please execute this letter on the signature line provided below.

Sincerely yours,

John Amann
V.P. Labor / Circulation
N.Y.P. Holdings, Inc.


Agreed:

John M. Heffernan
President
New York Newspaper Printing
Pressmen's Union No. 2


CONFIDENTIAL

August 9, 2000


Mr. John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

This letter is written to confirm the understanding reached during our recent negotiations regarding the New York Post Craft Union Pension Plan. The Publisher agrees to continue for the duration of this Agreement the New York Post Craft Union Pension Plan which provides a maximum benefit of $50.00 per month as described in the Plan document. The Publisher, however, retains the right to change, modify or replace the existing plan. However, the changed, modified or replacement plan will provide benefits of equal or greater value than the existing plan to plan participants.

If this letter accurately and completely sets forth our agreement concerning the issues addressed in this letter, please execute this letter on the signature line provided below.

Sincerely yours,

John Amann
V.P. Labor /Circulation
N.Y.P. Holdings, Inc.


Agreed:

John M. Heffernan
President
New York Newspaper Printing
Pressmen's Union No. 2


**CONFIDENTIAL**

NYP 00440

August 9, 2000

Mr. John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

This letter is to confirm the understanding reached during our recent negotiations that if the
newsprint towveyor fails to operate during a production shift for more than one (1) hour during
which time the towveyor would normally be running in order to deliver rolls of newsprint to the
press units, the Publisher shall hire an additional journeyman for each press in operation
regardless of when the breakdown occurs.  This letter shall be deleted upon the closing of 205
South Street.

If this letter accurately and completely sets forth our agreement concerning the issues addressed
in this letter, please sign where indicated below.

                                        Sincerely yours,


                                        _____
                                        John Amann
                                        V.P. Labor /Circulation
                                        N.Y.P. Holdings, Inc.


Agreed:

_____
John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2




CONFIDENTIAL

NYP 00441

August 9, 2000

Mr. John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

This letter is written to confirm the understanding reached regarding a chairman's office during our recently concluded contract negotiations. N. Y. P. Holdings, Inc. agreed that it will provide an office within the pressroom or adjacent area for the exclusive use of the pressroom chairman.

Sincerely yours,

Agreed:

_____           _____
John Heffernan, President           John Amann
New York Newspaper Printing         V.P. Labor / Circulation
Pressmen's Union No. 2              N.Y.P. Holdings, Inc.

CONFIDENTIAL

NYP 00442

August 9, 2000

Mr. John M. Heffernan
President
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

This will confirm that if the South Street Diner should close during the term of the Collective Bargaining Agreement between N. Y. P. Holdings, Inc. and New York Newspaper Printing Pressmen's Union No. 2, N. Y. P. Holdings, Inc. will establish a hot food service for employees other than vending machines and microwave ovens. This letter shall be deleted upon the closing of 205 South Street.

Sincerely yours,

John Arnann
V.P. Labor /Circulation
N.Y.P. Holdings, Inc.

Agreed:

John M. Heffernan
President
New York Newspaper Printing
Pressmen's Union No. 2

**CONFIDENTIAL**

August 9, 2000

Mr. John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

This letter is written to confirm the understandings reached concerning vacation bonus payments currently paid to pressroom employees.

N. Y. P. Holdings, Inc. and New York Newspaper Printing Pressmen's Union No. 2 agreed that the practice of paying certain bonus amounts with vacation pay will continue and will be paid as calculated below for the term of the Agreement (October 31, 2015) and shall be increased consistent with any wage increases during the term of this Agreement. For each shift of vacation entitlement, a bonus will be paid calculated by multiplying the employee's daily wage rate by .1273.

Commencing the next full vacation year, contingent upon receipt of IRS approval, the company will pay the bonus into the employees' 401K account on or about June 30 of the calendar year. If for any reason the Publisher cannot implement this payment, the vacation bonus will continue to be paid as in the past.

If this letter accurately and completely sets forth our understanding concerning the issues addressed in this letter, please execute this letter on the signature line provided below.

Sincerely yours,

Agreed:

John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

John Amana
V.P. Labor / Circulation
N.Y.P. Holdings, Inc.

**CONFIDENTIAL**

NYP 00444

August 9, 2000

Mr. John M. Heffernan
President
New York Newspaper Printing Pressmen's
Union Number Two
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

        Re:     **Regular Situations**

Dear Mr. Heffernan,

        By letters dated September 7, 1993 and April 26, 1994, N.Y.P. Holdings, Inc. (Publisher of the New York Post) and New York Newspaper Printing Pressmen's Union Number Two, N.Y.P. Holdings, Inc. agreed, subject to certain provisions of the collective bargaining agreement, to maintain a list of 50 named journeymen and juniors who would be guaranteed the opportunity to work five (5) straight time shifts per week. The letter of April 26, 1994 provided that:

> "If during the term of the present collective bargaining agreement the Publisher builds a new production facility and/or installs new presses, the parties will meet to discuss the impact of such new facility and/or equipment on this understanding and to determine whether more or less regular situations will be needed."

        During discussions mandated by said letter, the parties agreed as follows:

        1)     Subject to the provisions of Section 10, the mark up provisions of Section 11, and Section 43 dealing with layoffs and suspensions, merger and consolidation and certain agreements reached regarding the move up and utilization of juniors on the Post priority list, the Publisher will continue to guarantee that the journeymen and juniors named on the shop priority list as of April 26, 1994 attached to the letter dated April 26, 1994 will have the opportunity to work five (5) straight-time shifts per week.

CONFIDENTIAL

NYP 00445

2)     As in the letters dated September 7, 1993 and April 26, 1994, this guarantee is conditioned on the named pressmen making themselves available for work and shall not apply to any employee whose employment is terminated due to retirement, resignation, discharge for cause or disability.

Sincerely yours,

Agreed:

John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

John Amann
V.P. Labor / Circulation
N.Y.P. Holdings, Inc.

**CONFIDENTIAL**

NYP 00446

August 9, 2000

Mr. John M. Heffernan, President
New York Newspaper Printing
  Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

This letter is written to confirm the understanding reached between N. Y. P. Holdings, Inc. and New York Newspaper Printing Pressmen's Union No. 2 that the Publisher will continue to offer pressroom employees the opportunity to receive one thousand dollars ($1,000.00) in life insurance with the employee paying sixty cents ($.60) per month toward the premium and the Publisher paying the balance of the premium.

If this letter accurately and completely sets forth our agreement concerning this matter, please sign where indicated below.

Sincerely yours,

Agreed:

_____
John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

_____
John Amann
V.P. Labor / Circulation
N.Y.P. Holdings, Inc.

CONFIDENTIAL

August 9, 2000

Mr. John M. Heffernan, President
New York Newspaper Printing
  Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

     This letter is written to confirm the understanding, reached between N. Y. P. Holdings, Inc. and New York Newspaper Printing Pressmen's Union No. 2 that the Publisher will continue to inform the pressroom of the page size for the current issue by 1 P.M. each day Monday through Friday.

                                           Sincerely yours,

Agreed:

_____        _____
John M. Heffernan, President        John Amann
New York Newspaper Printing       V. P. Labor / Circulation
Pressmen's Union No. 2          N.Y.P. Holdings, Inc.

CONFIDENTIAL

NYP 00448

August 9, 2000

Mr. John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2
275 7ᵗʰ Avenue, 15ᵗʰ Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

     This letter is written to confirm the understanding reached between N. Y. P. Holdings, Inc. and New York Newspaper Printing Pressmen's Union No. 2 that the Publisher shall be privileged to select any journeyman who is a member of the Union in good standing to be foreman and assistant foreman pursuant to Section 11 of the Agreement.

     If this letter accurately and completely sets forth our agreement concerning this matter, please sign where indicated below.

Sincerely yours,

Agreed:

John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

John Argann
V.P. Labor/ Circulation
N.Y.P. Holdings, Inc.

CONFIDENTIAL

NYP 00449

August 9, 2000

Mr. John M. Heffernan, President.
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

This letter is to confirm the understandings reached during our recent negotiations regarding the no strike - no lockout obligations in Section 42 of the Collective Bargaining Agreement ("Agreement"). The Publisher agrees that not withstanding anything in section 42 of the Agreement to the contrary, the Union reserves the right to support a strike of the New York Paperhandlers' and Straighteners' Union Number 1 or of the New York Stereotypers' Union Number 1 against the Publisher which has been duly authorized under the laws of the GCIU. The Union agrees that it will not support a strike or work stoppage under any other circumstances.

Sincerely yours,

Agreed:

John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

John Amann
V.P. Labor / Circulation
N.Y.P. Holdings, Inc.

CONFIDENTIAL

NYP 00450

## GUIDELINES FOR MAINTENANCE, CLEANING AND MAKE-READY

N.Y.P. Holdings, Inc. and New York Newspaper Printing Pressmen's Union No. 2 have agreed that in order to ensure that equipment located in the pressroom as well as the pressroom itself is regularly, properly an adequately cleaned and maintained, flexibility in the handling of work assignments and cooperation between the parties in the performance of the work to be done and in dealing with special problems is vital. The outline of work expectations set forth below is a guideline only. Pressmen performing maintenance and clean-up may do more or less work than specified below on a daily basis depending on circumstances and conditions on any given day.

### DAY CREW

Performing:     Maintenance, Cleanup, and Make-ready

| HIRES | JOURNEYMEN | JUNIORS | TOTAL |
|---|---|---|---|
| Monday | 5 | 3 | 8 |
| Tuesday | 5 | 3 | 8 |
| Wednesday | 4 | 3 | 7 |
| Thursday | 5 | 3 | 8 |
| Friday | 5 | 3 | 8 |
| | 24 | 15 | 39 |

CONFIDENTIAL

Guidelines for daily workload:

Journeymen:

The journeymen will perform the following functions on a typical work day:

1) Thoroughly clean inside and outside of four (4) units and four (4) reels.

2) Thoroughly clean color-hump and pull out boxes if necessary.

3) Light cleaning of four (4) additional units (shells only).

4) All maintenance work needed downstairs or upstairs including setting of rollers.

5) Make-ready all four (4) presses.

JUNIORS

#1    Junior - "Folder Boy"

    1) Vacuum & thoroughly clean two (2) folders.

    2) Thoroughly clean press floor (press level).

    3) Thoroughly clean one-half (1/2) reelroom.

# 2   Junior - "Pipe Roller Boy"

    1) Thoroughly clean all pipe rollers on press level.

    2) Thoroughly clean superstructure and catwalks.

# 3   Junior

    1) Thoroughly clean four (4) units of rollers & superstructure on both sides.

    2) Supply, handle and store rags & cleaning equipment.

    3) Thoroughly clean one-half (1/2) reelroom.

CONFIDENTIAL

NYP 00452

Roller Work:

When it is necessary to remove and replace rollers.

1)     Outside rollers-two (2) journeymen can do all associated work on eight (8) rollers (both sides) in a day.

2)     Inside rollers - four (4) journeymen to remove and replace rollers. It is understood that two (2) journeymen will be assigned other maintenance and/or cleanup duties when not performing the actual removal and/or installation of the rollers dependent upon time availability.

These Guidelines for Maintenance, Clean-Up and Make-Ready shall be deleted upon the closing of South Street and be of no further force and effect.

**CONFIDENTIAL**

NYP 00453

<u>Addendum Re: Work In Addition To Changing Rollers</u>

1)    Four (4) men to replace a roller in black unit or H, G, C-1, C roller in collor hump plus, if there is sufficient time remaining after replacing the roller the men will do one of the following:

    1)    Replace slitters. or trolleys and lubricate trolleys and slitters on four (4) folders, or

    2)    Clean shells of two (2) units; or,

    3)    Change rubbers as needed and change knife box as needed; or,

    4)    Change snorkels on one (1) unit 10 + 13 side; or

    5)    Clean-out smash-ups; or

    6)    Change blankets on one (1) unit complete or a combination of four (4) blankets; or

    7)    Set rollers on any of the above.

#2    Two (2) men to replace either B, C, D, G, H roller or a combination of two (2) rollers in black unit plus, if there is sufficient time remaining after replacing the roller the men will do one of the following:

    1)    Replace slitters or trolleys and lubricate trolleys on four (4) folders; or

    2)    Clean shells of two (2) units; or

    3)    Change rubbers as needed and change knife box as needed; or

    4)    Change snorkels on one (1) unit 10 + 13 side; or

    5)    Clean-out smash-ups; or

    6)    Change blankets on one (1) unit complete or a combination of four (4) blankets; or

    7)    Set rollers on any of the above.

CONFIDENTIAL

NYP 00454

# 3    Three (3) men to replace B roller in color hump plus, if there is sufficient time remaining after replacing the roller, the men will do one of the following:

1)    Replace slitters or trolleys and lubricate trolleys and slitters on four (4) folders, or

2)    Clean shells of two (2) units; or

3)    Change rubbers as needed and change knife box as needed; or

4)    Change snorkels on one (1) unit 10 + 13 side; or

5)    Clean-out smash-ups; or

6)    Change blankets on one (1) unit complete or a combination of four (4) blankets; or

7)    Set rollers on any of the above.

Upon the closing of 205 South Street the foregoing Addendum shall be deleted and of no further force and effect. It shall be replaced by the following:

The Publisher shall employ a roller crew consisting of five persons (4 journeymen including 2 PIC's and 1 junior) five days per week. It is expected that the crew will do all work required by the foremen associated with the removal and replacement (in and out) of rollers, removal and replacement of blankets, or maintenance and/or cleaning duties if not enough blanket or roller work is needed to be done, dependent upon time availability. It is understood in making such assignments of work, the foremen will take into consideration the circumstances then being confronted and roller crew employees will put forth their best efforts to perform the work assigned in an efficient and workman-like manner.

CONFIDENTIAL

NYP 00455

August 9, 2000

Mr. John M. Heffernan, President.
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

       If the Publisher elects to split a tower press unit when all tower press units are not being utilized, the Publisher will man so there will be no reduction of manning because of having done so.

Sincerely yours,

Agreed:

_____
John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

_____
John Amann
V.P. Labor /Circulation
N.Y.P. Holdings, Inc.

CONFIDENTIAL

NYP 00456

August 9, 2000

Mr. John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

    The Publisher agrees to maintain the present practice as to maintenance at 205 South Street at that facility. Additionally, the Publisher agrees to review its day maintenance manning at the Bronx facility ninety days after full color operation is achieved. Finally, examples of how post run cleaning time works:

(without blanket washers)
scheduled off time: 4:30
actual off time: 4:00
overtime: one half hour

(with blanket washers)
scheduled off time: 4:30
actual off time: 4:00
overtime: none

Sincerely yours,

Agreed:

John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

John Amann
V.P. Labor /Circulation
N.Y.P. Holdings, Inc.

CONFIDENTIAL

-60-

NYP 00457

August 9, 2000

Mr. John M. Heffernan, President.
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

During the recent negotiations for an amended labor agreement, the Post and the Union were uncertain as to the amount of roller and blanket removal and replacement work that could reasonably be expected on a scheduled, dedicated shift for preventative maintenance work. The parties wishing to foster and promote a cooperative working relationship, have agreed to the following in order to have sufficient information available for them to arrive at an informed and reasonable agreement:

The Post and Union agree that for a scheduled, dedicated day of roller and blanket maintenance, the roller crew employees will do all work associated with the removal and replacement (in and out) of rollers and blankets. The normal number of rollers, absent unusual events or circumstances outside of the roller crew's control, to be removed and replaced for the first six (6) months after full operations have commenced at the Bronx facility will be between eight (8) rollers in and eight (8) rollers out and ten (10) rollers in and ten (10) rollers out; or, in lieu of rollers between twenty-four (24) and thirty (30) blankets, or any combinations thereof using a formula of three (3) blankets equals one (1) roller.

At the end of the first six (6) months after full operations have commenced at the Bronx facility, the parties will meet to review the amount of work being assigned on a scheduled, dedicated roller and blanket preventative maintenance shift to ensure that the amount required is not unduly burdensome.

Sincerely yours,

Agreed:

John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

John Amann
V.P. Labor /Circulation
N.Y.P. Holdings, Inc.

**CONFIDENTIAL**

-61-

NYP 00458

August 9, 2000

Mr. John M. Heffernan, President.
New York Newspaper Printing
Pressmen's Union No. 2
275 7th Avenue, 15th Fl.
New York, N.Y. 10001

Dear Mr. Heffernan:

       There will be established a casual rate of $150 a day for all casuals regardless of the work performed except when a casual is elevated to journeyman status in which case the casual shall receive the journeyman's rate of pay. This will be the rate upon which all future raises for casuals will be based. The Publisher will maintain a bookkeeping account of all casual shifts, other then when performing as a journeyman, performed after ratification of this agreement. The account will be credited the difference between the casual rate and 83.36 percent of the Journeymen rate. In December of each year, the Union President will notify the company of distribution of this fund equally among all non-supervisory employees on the Post priority list. The President may elect to place the money in a) 401k account subject to receiving IRS approval b) Health and Welfare Fund or c) Pension Fund.

After ratification by the Union, the foregoing changes and letters will be incorporated into the parties' collective bargaining agreement.

                                            Sincerely yours,

Agreed:

John M. Heffernan, President
New York Newspaper Printing
Pressmen's Union No. 2

John Amann
V.P. Labor /Circulation
N.Y.P. Holdings, Inc.

CONFIDENTIAL

NYP 00459

**EXHIBIT C**

# AFFIDAVIT OF SERVICE

### UNITED STATES DISTRICT COURT/SOUTHERN DISTRICT OF NEW YORK
_____ *No. 07 CV 5580*

**NYP HOLDINGS INC., d/b/a NEW YORK POST**
                    *Plaintiff,*

-*against*-

**NEW YORK NEWSPAPER PRINTING PRESSMEN'S UNION
LOCAL NO. 2, ET ANO,**
                    **Defendants.**
_____

State Of New York, County of New York SS.:
**STANTON CAGNEY**
Being duly sworn, deposes and says that he is over the age of 18 years, is not a party to this action and resides in New York.

That on the 13TH day of JUNE 2007, At: 8:24 PM

At:  **C/O NY POST, 900 EAST 132ND STREET, BRONX, NEW YORK**

Deponent served the Annexed: **SUMMONS IN A CIVIL CASE, COMPLAINT, PROCEDURES FOR ELECTRONIC CASE FILING AND 3RD AMENDED INSTRUCTIONS FOR FILING AN ELECTRONIC CASE OR APPEAL**

Upon: **CHRISTOPHER CAPANELLI**

### PERSONAL SERVICE ON AN INDIVIDUAL
An individual, by delivering thereat a true copy to **CHRISTOPHER CAPANELLI** personally; deponent asked the person spoken to if he was the named defendant, and he replied in the affirmative. Upon this information and belief, deponent knew that the person spoken to was the named defendant: **CHRISTOPHER CAPANELLI**

### DESCRIPTION - Deponent describes the individual served or spoken to as follows:
Sex: **MALE** Color: **WHITE** Hair: **BROWN** App. Age: **38** App. Ht: **5'10"** App. Wt. **140**
Other identifying features:

Sworn to before me this **14TH**
day of JUNE, 2007

**JOLANTYNA CAGNEY**
NOTARY PUBLIC, State of New York
No. 01CA6111489
Qualified in New York County
Commission Expires June 14, 2008

STANTON CAGNEY 700-117

07 CV 5580

## UNITED STATES DISTRICT COURT
Southern District of New York

---

NYP HOLDINGS, INC. d/b/a NEW YORK POST,              x

Plaintiff,                               :

- against -                                            :

NEW YORK NEWSPAPER PRINTING                         :
PRESSMEN'S UNION LOCAL NO. 2 and
CHRISTOPHER CAPANELLI,                               :

Defendants.                      :

---                                                    x

**SUMMONS IN
A CIVIL CASE**

CASE NUMBER:

07 CIV _____

TO:
(Name and address
of defendants)

Newspaper Printing
Pressmen's Union Local 2
275 Seventh Avenue
Suite 1500
New York, NY 10001

Christopher Capanelli
20 Coconut Drive
Commack, NY 11725

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEYS, Michael Starr, Esq., HOGAN & HARTSON L.L.P., 875 Third Avenue, New York, New York 10022, an answer to the Complaint which is herewith served upon you, within _20_ days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

JUN 1 1 2007

_____                    _____
CLERK                                       DATE

_____
(BY) DEPUTY CLERK