AMERICAN ARBITRATION ASSOCIATION
OPINION AND AWARD

---

In the Matter of the Arbitration

between

**NYP HOLDINGS, INC.**

and

**NEW YORK NEWSPAPER PRINTING PRESSMEN'S UNION LOCAL NO. 2**

---

AAA Case No: 13 300 0081 04
Discharge of Christopher Capanelli

BEFORE: Barbara Zausner, Arbitrator

AWARD DATED: June 12, 2006

APPEARANCES

    Baker & Hostetler
    Attorneys for the Employer
    By, Elliot S. Azoff, Esq.
       Tracy Cole, Esq.

    Shapiro, Beilly, Rosenberg, Aronowitz, Levy & Fox
    Attorneys for the Union
    By, Barry I. Levy, Esq.

### ISSUE

Did the Employer have just cause to discharge the grievant?

If not, what shall be the remedy?

## BACKGROUND

On December 18, 2003, the New York Post terminated the employment of the grievant, Christopher Capanelli, on grounds that he defaced the locker of another Post employee, Jason Quick. The vandalism is alleged to have occurred during the early morning hours of October 24, 2003.

The Union filed a grievance on Capanelli's behalf that was moved to arbitration. I held hearings on May 31, June 28, July 6, October 21, 2005; January 20 and March 7, 2006. The record was closed, pursuant to the rules of the American Arbitration Association, on receipt of the parties' post-hearing briefs.

## DISCUSSION

The direct evidence against the grievant consists of a surveillance videotape taken on the night in question and this evidence forms the basis of the Post's allegation. In addition, the Post asserts that the grievant had motive and opportunity to commit the offense. Nonetheless, because I am not convinced that the Post has met its burden of proving that the grievant is the person shown on the tape or that he committed the act for which

2

his employment was terminated, I find that the discharge was not for just cause.

The Employer publishes the daily newspaper, The New York Post. The Union is the collective bargaining representative of the employees working in the Post's pressroom where the newspaper is printed. At the time the offense in question occurred, the grievant was serving as Chapel Chairman for Local 2 of the New York Printing Pressmen's Union and was responsible for acting as on-site liaison between the Union and the Publisher.

Mr. Quick, the employee whose locker was vandalized, "was one of several pressmen initially hired in a manner opposed by the Union." (Employer's Brief, p. 2). The dispute over their hiring was resolved at a Joint Conference Committee on July 23, 2004. Ultimately, Quick and the others were issued union cards. "The hiring practice was somewhat controversial because it allowed these ... men to become regular situation holders ... ahead of people who had held priority on the casual list that the Company maintained." (Union Brief, p. 5).

Over a period beginning on August 4, 2003, and continuing through May 6, 2004, Jason Quick became the subject of repeated harassment. Because he is an African-American, "his continual

3

harassment caused consternation at the Post." After consulting with the Bronx District Attorney's office, the Post "placed a hidden camera in the locker room focused on Mr. Quick's locker." (Company Brief, p. 3).

Mr. Quick's locker was vandalized on at least ten separate occasions and, while no perpetrator was ever identified, it is undisputed that, except for the incident which gave rise to the grievant's termination, Mr. Capenelli, himself, could not have been the person responsible. In each instance, he was out of the building at the time the damage occurred. (Union Brief, p. 6).

Mr. Capanelli appears to have been concerned about the incidents. In October of 2003, the record shows, he raised the issue of continuing vandalism to Mr. Quick's locker during a chapel meeting and told those present that "the stuff had to stop." The Post, he said, was holding him accountable for other people's actions. Still, the vandalism continued.

The camera was hidden in a ceiling vent and focused on Mr. Quick's locker and videotapes of the area were gathered by the Post. The tapes do not provide a continuous record, however. During the period between October 18, 2003 and October 23, 2003 there were periods where no recording occurred and, for

4

undisclosed reasons, tapes which had been recorded during the twenty-four hours just prior to the time in question were destroyed. The information on them was not available for review. (Union Brief, pp. 7-8).

In the early morning hours of October 24, 2003, the hidden camera recorded the two sequences of video that are at issue here. The first of the two shows a thirteen second sequence of someone in the vicinity of Mr. Quick's locker at approximately 2:37 a.m. The second, recorded moments later, shows a twenty-one second sequence of this person in proximity to the locker as he holds an object, which the grievant's counsel identifies as looking like a rag or a towel. Because the tape is of very poor visual quality, the object being held by the person on the tape cannot be accurately determined nor can one be sure of what the person is doing.

The Post argues that the person in the tape is the grievant, Mr. Capanelli, although his face is not clearly visible. The identification is made based on certain physical characteristics which the person shown and the grievant have in common, and on the fact that the subject of the tape wears a uniform shirt that looks like the one Mr. Capanelli was wearing that night.

5

The parties stipulate that had they been called to testify, eight other pressmen would have stated their belief that the person whose image appears on the tape is the grievant. Mr. Capanelli denies that he is the person on the tape. He denies being in the locker room at all. An alibi witness, Vincent Valerio, testified that he and the grievant were elsewhere at the time.

Nonetheless, even conceding for the sake of argument that the person shown on the tape is, in fact, the grievant, the more crucial question is what the second segment of the tape, allegedly showing the defacing of the locker, actually depicts.

The act of vandalism for which Mr. Capanelli was fired is the etching of the word "scab" on the metal front surface of Quick's locker. The person on the tape does not clearly make motions consistent with creating an etching, nor can the subject of the video be observed in the act of defacing the locker. It is possible that he may be holding a cloth, as the Union contends, and is trying to wipe the locker clean. In any event, the tape is of such poor quality and the image of the subject of the tape so obscured, that it is impossible to be reasonably sure in what kind of activity the person pictured is actually engaged.

6

### Standard of Proof

As stated, Mr. Capanelli was fired for defacing the property of his employer by scratching letters into the door of Mr. Quick's locker and, by doing so, harassing one of his own Union members. In his position as the Union's Chapel Chairman, Mr. Capanelli had a special duty to his members as well as to his employer to maintain a high standard of integrity and to insure smooth operations at the facility. He was held to a higher standard of conduct than is an ordinary employee and his failure to meet that higher standard would put both his career and his reputation in jeopardy. The parties stipulate that there is no claim that the vandalism was racially motivated.

The Union argues that the Employer must meet its burden "by clear and convincing evidence" because the charges against the grievant "allege quasi-criminal behavior on his part." (Union Brief, p. 11). In the Company's view, "vandalism of a locker is not stigmatizing conduct ... so the preponderance of evidence standard should apply." (Company Brief, p. 20).

My own preference is for the view of Arbitrator Murphy, quoted in the Employer's brief, who said "what is necessary is that the arbitrator be sufficiently convinced of the truth of the facts."

7

As attorneys for the Post argue in their brief, the grievant's acquittal in the criminal case which arose out of the incident for which his employment was terminated, is not relevant to this proceeding.

As noted above, the videotape on which the Post relies is of poor quality and the nature of the act depicted on it is difficult to discern. It is simply not possible, based the tape and the other evidence presented at the hearing, for me to conclude with the requisite degree of certainty that Mr. Capanelli is the person whose image appears on the surveillance tape or that he etched the word "scab" into the metal of Mr. Quick's locker. Because these allegations, if true, are stigmatizing and carry with them consequences for the grievant's career and his reputation, I conclude that the Employer has not provided convincing evidence that the grievant is the person responsible for defacing Quick's locker.

I agree with the Employer that the image on the videotape bears a strong resemblance to Capanelli but, as the Union asserts, "the evidence presented does not establish that Mr. Capanelli was the individual on the videotape." More significant, as the Union

8

also notes, the evidence does not prove "that the etching on the locker took place on the morning of October 24, 2003."

The others who identified Capanelli as the individual on the tape may well have been satisfied that he is the man in the video. But I cannot rely on their certitude to convince me. Even if he is the person shown, there may be alternate explanations for his presence. To reiterate, though, the tape does not reveal what the person is doing.

The number, variety and persistence of the malicious pranks involving Quick's locker (and he is not the only person who has been subjected to such childish behavior) suggests a widespread tolerance for such cowardly acts against innocent fellow employees. Many others had the opportunity to deface (and otherwise tamper with) Quick's locker, either during the time the tape was running or during a time for which there is no tape. Chris Nash's testimony leaves many hours unaccounted for. He left the building around 5 or 5:30 on October 23 and did not return until sometime the next morning.

Like the Post, I have difficulty with the grievant's various defenses. First, bad as the video images are, the resemblance between the shadowy figure shown and the grievant is quite

9

strong. The grievant's "alibi" evidence is pretty well demolished by the Employer who reasonably concludes, "Valerio's testimony substantively is not credible as he was incapable of creating a timeline that realistically could have occurred." (Company Brief, p. 41). Nevertheless, absent convincing evidence that Capanelli vandalized the locker, the alibi testimony is irrelevant. Perhaps someone else did the deed and Valerio and Capanelli covered it up.

It is the Post's final argument, that "the videotape depicts the vandalism", that fails. The "straight object" that the Employer sees in the videotape is not visible to me nor can I tell what the person in the locker room is doing.

In short, while I suspect that Capanelli knows more than he admits and while I strongly suspect that it was he in the locker room in the early morning of October 24, 2003, the evidence does not rise to the level necessary to convince me that the grievant is guilty as charged. Therefore, I must sustain the grievance.

## AWARD

The grievance is sustained. The grievant is entitled to reinstatement with full back pay as though no discharge had occurred.

By: *[signature]*
Barbara Zausner, Arbitrator
June 12, 2006

I affirm on my oath of office that the foregoing is my opinion and award.

*[signature]*
Barbara Zausner